UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
MARTIN GRANT,

                      Plaintiff,         <u>MEMORANDUM & ORDER</u>
                                         09-CV-1540(JS)(AKT)
        -against-

ROCHE DIAGNOSTICS CORPORATION,

                      Defendant.
-------------------------------------X
APPEARANCES
For Plaintiff:    Ira Newman, Esq.
                  Law Office of Ira S. Newman
                  98 Cutter Mill Road, Suite 441-south
                  Great Neck, NY 11021

For Defendant:    Edward P. Boyle, Esq.
                  Venable LLP
                  1270 Avenue of the Americas, 25th Floor
                  New York, NY 10020

                  Kenneth J. Yerkes, Esq.
                  David J. Pryzbylski, Esq.
                  Barnes & Thornburg
                  11 South Meridian Street
                  Indianapolis, IN 46204

SEYBERT, District Judge:

        Plaintiff Martin Grant ("Mr. Grant" or "Plaintiff")

filed suit against Defendant Roche Diagnostics Corporation

("Roche" or "Defendant"), alleging violations of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 <u>et</u>

<u>seq.</u>, and the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law

§ 296. Pending before the Court is Roche's motion for summary judgment. For the following reasons, Roche's motion is GRANTED.

BACKGROUND[1]

Mr. Grant was hired by Roche as an Account Manager in November 2000 when he was 46 years old. (Def. 56.1 Stmt. ¶ 3.) Greg O'Neal, a Regional Business Manager at Roche, was one of the individuals who interviewed Mr. Grant and took part in the decision to hire him. (Def. 56.1 Stmt. ¶ 4.) Mr. O'Neal became Mr. Grant's direct supervisor in early 2001 and remained his supervisor until he was terminated in 2008. (Pl. Dep. 109-10.)

As an Account Manager, Mr. Grant's main function was to sell Roche products to hospitals in his assigned region, which, as of 2003, was Territory 11HF. (Def. 56.1 Stmt. ¶¶ 5, 8; Pl. 56.1 Stmt. ¶ 8.) Like all Account Managers, Mr. Grant received annual evaluations from his supervisors which provided feedback with respect to his performance in various areas and was given one of five ratings: (1) Far Exceeds Standards, (2) Exceeds Standards, (3) Meets Standards, (4) Needs Development, or (5) Unsatisfactory. (Def. 56.1 Stmt. ¶ 24.)

On his 2001 review, although Mr. Grant received a "Meets Standards" rating, Mr. O'Neal provided some negative feedback, including:

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements ("56.1 Stmt.") and their evidence in support. Any relevant factual disputes are noted.

- "Martin achieved 94% of his diabetes dollar goal for 2001--which was below goal and disappointing."

- "Martin needs to devote more focus to penetrating and driving sales at competitive accounts for closes."

- "Martin needs to continue to focus on listening to his customers, probing with questions, and not rushing to conclusions in his eagerness to sell a Roche solution and close the customer."

(Pl. 56.1 Stmt. Ex. B). The 2001 review concluded by stating that although Mr. Grant had a "challenging year" and finished below goal, it was due, in part, to having inherited a territory that had been neglected. (Id.)

On his 2002 review, Mr. Grant again received a "Meets Standards" rating. Mr. O'Neal recognized Mr. Grant's accomplishments and successes for the year but the review also echoed some of the same criticisms from the prior year, including a "disappointing" negative sales growth and a need to focus more on closing competitive accounts. (Id. at Ex. D.)

Mr. Grant's performance improved in 2003, and Mr. O'Neal awarded him an "Exceeds Standards" rating, acknowledging his "outstanding accomplishments," but warned that "it is going to be very important for Martin to continue to expand his presence in his competitive accounts." (Id. at Ex. C.)

In 2004 and 2005, Mr. Grant again received "Meets Standards" ratings. The reviews were mostly positive despite his below average sales performances; however, Mr. O'Neal

emphasized in both reviews that conversion of competitive accounts was critical and should be Plaintiff's primary focus for the following year. (Pl. 56.1 Stmt. Ex. D.) Mr. Grant never submitted any written response expressing disagreement with these annual reviews. (Def. 56.1 Stmt. ¶ 31.)

In 2006, Roche, in particular Area Business Manager William Randy Hitchens,[2] encouraged more frequent "ride-withs" by Mr. O'Neal and the other Regional Business Managers with Account Managers. During these ride-withs, Mr. O'Neal would spend the day with an Account Manager to observe his or her interaction with customers and then offer feedback in the form of a coaching report.[3] (Def. 56.1 Stmt. ¶¶ 53-54.) Mr. O'Neal conducted seven ride-withs with Mr. Grant during the course of 2006 and prepared reports[4] expressing similar concerns regarding Mr. Grant's lack of focus on developing and converting E accounts.[5] (Def. 56.1

---

[2] Mr. Hitchens was the Area Business Manager to whom Mr. O'Neal reported from June 2005 until February 2008. (Def. 56.1 Stmt. ¶ 44.)

[3] The actual coaching report is a form that lists different skill areas (for example, ability to identify decision makers, ability to overcome objectives). Mr. O'Neal would give each Account Manager a grade in only the skill areas that he witnessed on that particular ride-with. The grades range from "O" (opportunity), which is the lowest, to "S" (strength), which is the highest, with "C" (competence) falling in the middle. (Pl. Opp. 24; Def. 56.1 Stmt. ¶¶ 53-54; Pl. 56.1 Stmt. ¶¶ 53-54.)

[4] Plaintiff denies that seven ride-withs occurred during 2006, thus indirectly questioning the authenticity of these coaching reports. (Pl. 56.1 Stmt. ¶ 55.)

[5] E accounts are accounts that are not currently using Roche products. (Def. 56.1 Stmt. ¶ 5.)

Stmt. ¶ 55; O'Neal Dec. Exs. I-O.)  During one of these ride-
withs, Plaintiff alleges that Mr. O'Neal told him that sales was
a "young man's game"[6] and that he needed to be more like a Jack
Russell Terrier.  (Pl. 56.1 Stmt. ¶¶ 18, 142.)

In November 2006, after personally observing Mr. Grant
make a presentation at a Regional Meeting, Mr. Hitchens sent him
an email identifying several areas where Mr. Grant needed to
show improvement in order to advance within Roche.  (Def. 56.1
Stmt. ¶ 64; Hitchens Dec. ¶ 7 & Ex. A.)  Specifically, Mr.
Hitchens directed Mr. Grant to listen to other people's
opinions, accept feedback, stay focused when presenting sales
plans, close competitive E accounts, and demonstrate superior
sales performance.  (Hitchens Dec. Ex. A.)  These suggestions
largely tracked the areas that Mr. O'Neal previously had
identified as areas in which Mr. Grant needed to improve.

In January 2007, Mr. O'Neal planned to issue Mr. Grant
a "Meets Expectations" rating on his 2006 annual performance
review, but Mr. Hitchens directed him instead to lower Mr.
Grant's rating to "Needs Development."  (Def. 56.1 Stmt. ¶¶ 69,
76.)  According to the 2006 review, Mr. Grant demonstrated
similar performance deficiencies in 2006 as in previous years,
including failing to close a major competitive E account and

---

[6] Mr. O'Neal denies making this statement.  (Def. 56.1 Counter-
Stmt ¶ 142.)

falling significantly below his target sales goal for the year. (Hitchens Dec. Ex. C.)

Mr. Grant continued to demonstrate these performance deficiencies in 2007, as evidenced by his ride-withs from May and August 2007. (Pl. Dep. Ex. 32, 33; Compl. Ex. F.) On June 20, 2007, Mr. Hitchens emailed Mr. O'Neal inquiring whether he had any "backup sales candidates" to take over Mr. Grant's territory because although they "ha[d] been over patient with him to change his behavior, [he] s[aw] no improvement." (Hitchens Dec. Ex. D.)

Rather than terminate Mr. Grant, in September 2007, Mr. Hitchens, Mr. O'Neal and Nina Perry, Roche's Human Resources Manager, developed a "coaching plan" which set out and clearly identified the areas in which Mr. Grant needed to demonstrate improvement, including improving his deficient sales performance, converting competitive E accounts, developing high-quality, organized sales plans, and improving his leadership and communication skills. (Def. 56.1 Stmt. ¶¶ 84-85, 87, 89.) Hitchens, O'Neal and Perry spent several weeks tailoring the goals and objectives in the plan to address Mr. Grant's individual needs. The process overall was similar to the process used to develop coaching plans for other Account Managers exhibiting performance deficiencies. (Def. 56.1 Stmt. ¶¶ 85-86.) Mr. Grant disagreed with the decision to put him on

a coaching plan and attempted to justify his poor performance. (Def. 56.1 Stmt. ¶ 90.) He argued, for example, that it was more difficult for him to close E accounts than other Account Managers because his territory was dominated by two large "Independent Health Networks" ("IHN's"), comprised of six and eleven hospitals respectively, which make their purchasing decisions as a unit, not as individual hospitals. Therefore, his territory had less opportunity for growth than others. (Pl. Opp. 10-11; O'Neal Dep. Ex. 28). He did not, however, argue that the decision-makers were motivated by discriminatory animus.

Plaintiff admits that by mid-October he was not meeting the objectives set forth in the coaching plan. (Pl. 56.1 Stmt. ¶ 93.) So, on or around December 1, 2007, Hitchens, O'Neal, and Perry placed Mr. Grant on a Performance Improvement Plan ("PIP"). (Def. 56.1 Stmt. ¶ 94, 96; Pl. 56.1 Stmt. Ex. Q.) Similar to the coaching plan, the PIP was the result of several weeks of collaboration among Hitchens, O'Neal, and Perry to specifically tailor the PIP to address Mr. Grant's performance deficiencies. (Def. 56.1 Stmt. ¶ 95.) The PIP set out objectives similar to those in the coaching plan.

Mr. Grant again failed to achieve his sales goals for 2007, and in February 2008, he was removed from the larger of his IHN accounts after administrators for two of the hospitals

expressed dissatisfaction with his service. (Def. 56.1 Stmt. ¶¶ 103, 107.) Mr. Grant argues that these administrators were dissatisfied with Roche's products not his performance, although one "had some kind of personality conflict with Martin Grant which may or may not have had anything to do with his job performance." (Pl. 56.1 Stmt. ¶ 25.)

On February 29, 2008, Mr. Grant's employment at Roche was terminated because, according to his termination letter, of his "inability to meet performance expectations." (Pl. Dep. Ex. 43.) He was 54 years old. (Def. 56.1 Stmt. ¶ 114.) The decision was made by Ms. Perry, Mr. O'Neal, Mr. Hitchens, who were 46, 46 and 55 years old respectively at the time. (Def. 56.1 Stmt. ¶ 116.) Roche replaced Mr. Grant with an Account Manager who was fifty years old. (Def. 56.1 Stmt. ¶ 119.)

On or about May 29, 2008, Mr. Grant filed a Charge of Discrimination in Employment with the EEOC, and on February 24, 2009, the EEOC issued a "right to sue" letter authorizing Mr. Grant to bring suit. He filed his Complaint in this matter on April 14, 2009, and on February 14, 2011, Defendant filed its motion for summary judgment.

DISCUSSION

I.  <u>Standard of Review</u>

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the

moving party is entitled to judgment as a matter of law."
Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In
re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998)
(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct.
2548, 91 L. Ed. 2d 265 (1986)); see also Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d
202 (1986).

"The burden of showing the absence of any genuine
dispute as to a material fact rests on the party seeking summary
judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir.
1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157,
90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "In assessing the
record to determine whether there is a genuine issue to be tried
as to any material fact, the court is required to resolve all
ambiguities and draw all permissible factual inferences in favor
of the party against whom summary judgment is sought." McLee,
109 F.3d at 134.

"Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,
once such a showing is made, the non-movant must 'set forth
specific facts showing that there is a genuine issue for
trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.
2000) (quoting Anderson, 477 U.S. at 256). "Mere conclusory
allegations or denials will not suffice." William v. Smith, 781

F.2d 319, 323 (2d Cir. 1986). Similarly, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41 (citing Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

In deciding a motion for summary judgment in a discrimination case, the court must "carefully scrutinize[]" an employer's papers, affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994). Thus, a court should not grant an employer's motion for summary judgment unless "the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." Viola v. Philips Medical Sys. of N. Am., 42 F.3d 712, 716 (2d Cir. 1994). Nevertheless, although the Court must closely examine an employer's evidence, summary judgment remains available in all discrimination cases. See Weinstock, 224 F.3d at 41-42 ("The 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" (quoting McLee, 38 F.3d at 68)).

II. Age Discrimination

Plaintiff claims that he was discriminated against on the basis of age in violation of the ADEA and the NYHRL. Both ADEA claims and NYHRL claims are analyzed under the McDonnell Douglas burden-shifting paradigm used in Title VII

10

discrimination cases.  See Woodman v. WWOR-TV, Inc., 411 F.3d
69, 76 (2d Cir. 2005) (holding that the McDonnell Douglas
burden-shifting framework applies to ADEA claims as well as race
discrimination claims under Title VII); Sutera v. Schering
Corp., 73 F.3d 13, 16 n.2 (2d Cir. 1995) (holding that courts
are to apply the same burden-shifting framework to claims under
the ADEA and the NYHRL).

     Under McDonnell Douglas, the plaintiff bears the
initial burden of establishing a prima facie case of
discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792,
93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Once the plaintiff has
satisfied the elements of the prima facie case, a presumption of
discrimination is created.  St. Mary's Honor Ctr. v. Hicks, 509
U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); Texas
Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct.
1089, 67 L. Ed. 2d 207 (1981).  The burden then shifts to the
defendant to produce "through the introduction of admissible
evidence, reasons for its actions which, if believed by the
trier of fact, would support a finding that unlawful
discrimination was not the cause of the employment action."  St.
Mary's Honor Ctr., 509 U.S. at 507 (citations and internal
quotation marks omitted); see also McDonnell Douglas, 411 U.S.
at 802.  Once such a reason has been presented, the presumption
of discrimination disappears and the burden again shifts to the

plaintiff to establish that the defendant's proffered non-discriminatory reason is mere pretext. See Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802-04). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

The Supreme Court recently clarified the standard for prevailing on an ADEA claim, holding that "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer's decision," and not merely a motivating factor, which had previously been the case. Gross v. FBL Fin. Servs., 129 S. Ct. 2343, 2351 (2009). Although Gross changed the later part of the McDonnell Douglas framework by eliminating the mixed-motive analysis, the Second Circuit held that it "remain[s] bound by, and indeed see[s] no reason to jettison, the burden-shifting framework for ADEA [and NYHRL] cases that has been consistently employed in [this] Circuit." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).[7]

---

[7] The Second Circuit in Gorzynski assumed, without deciding, that the Supreme Court's decision in Gross affected the scope of the NYHRL as well as the ADEA, 596 F.3d at 106 n.6, and both parties assert that the "but-for" standard applies to Plaintiff's NYHRL claim. (Def. Mem. 17; Pl. Opp. 7.) However, this Court need not decide whether the Gross standard applies, because it finds

A.   Prima Facie Case

To meet his initial burden of establishing a prima facie case for age discrimination, Mr. Grant must show that: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) the surrounding circumstances permit an inference of discrimination. See Gorzynski, 596 F.3d at 107. Defendant does not contest the first or third elements of Mr. Grant's prima facie case, as it is conceded that Mr. Grant was within the protected age group when he was terminated from his employment. (Def. 56.1 Stmt. ¶ 114.) Potentially at issue are whether Mr. Grant was qualified for the position and whether his termination occurred under circumstances giving rise to an inference of discrimination.

1.   Whether Plaintiff was Qualified for the Position

"[T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job.'" Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001) (second alteration in original) (quoting Owens v. N.Y. City Hous. Auth.,

that no reasonable jury could conclude that age was a motivating factor in Defendant's decision to terminate Plaintiff, let alone the but-for cause of that decision.

13

934 F.2d 405, 409 (2d Cir. 1991)); Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001). "[W]here discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." Slattery, 248 F.3d at 92; Gregory, 243 F.3d at 696. "[B]y hiring the employee, the employer itself has already expressed a belief that [he] is minimally qualified," and by retaining the employee for a significant period of time, "the strength of the inference that [he] possesses the basic skills required for [his] job is heightened." Gregory, 243, F.3d at 696; see also Mattera v. JPMorgan Chase Corp., 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010) (the fact that plaintiff was hired for the position and remained employed for two years was sufficient to establish qualification for the position); Arrocha v. CUNY, No. 02-CV-1868, 2004 WL 594981, at *4 (E.D.N.Y. Feb. 9, 2004) (same).

Defendant's argument that Mr. Grant was not qualified because of his repeated performance deficiencies is misplaced. While an employer's dissatisfaction with an employee's performance may ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action, to satisfy his burden Mr. Grant need only "establish basic eligibility for the position at issue." Slattery, 248 F.3d at 92. In fact, the Second Circuit has held that it is "error to find that plaintiff has not established a prima facie case

14

merely because employer was dissatisfied with plaintiff's performance." Chukwurah v. Stop & Shop Supermarket Co., 354 Fed. Appx. 492, 494-95 (2d Cir. 2009); see also Slattery, 248 F.3d at 92 ("Although the defendant did properly offer up its dissatisfaction with Slattery's work performance as its legitimate business reason for discharge, there is no basis for the district court's conclusion that Slattery lacked even minimal qualification for a job whose duties he had been performing for seven years."); Mattera, 740 F. Supp. 2d at 572 (although plaintiff received poor performance evaluations during his tenure at defendant company, the fact that he was hired for the position and remained employed for two years satisfied the minimal burden of showing that he was qualified for the position); Suarez v. Am. Stevedoring, Inc., No. 06-CV-6721, 2009 WL 3762686, at *10-11 (E.D.N.Y. Nov. 10, 2009) ("Notwithstanding plaintiff's irregular attendance record, the court concludes that the evidence sufficiently establishes that plaintiff was minimally qualified to perform duties of a longshoreman," even though "excessive absenteeism has repeatedly been cited by courts as evidence of lack of satisfactory job performance.").

Therefore, since Mr. Grant was hired in 2000 as an Account Manager and remained employed at Roche in the same position for nearly eight years prior to being terminated, he

has sufficiently established that he was qualified for the position.

2. <u>Whether the Discharge Occurred under Circumstances Giving Rise to an Inference of Discrimination</u>

It is less clear whether the circumstances of Mr. Grant's termination permit an inference of discrimination. The totality of Mr. Grant's argument supporting the existence of age discrimination amounts to the following: (1) for the first four years of his employment, Mr. Grant received "Meets Standards" or "Exceeds Standards" ratings from Mr. O'Neal (Def. 56.1 Stmt. ¶¶ 26, 29; Pl. 56.1 Stmt. ¶¶ 26, 29); (2) Mr. O'Neal told Mr. Grant during a ride-with in 2006 that sales was a "young man's game" and that he has to be like a Jack Russell Terrier (Pl. 56.1 Stmt. ¶¶ 18, 142); (3) he was given a "coaching plan" and placed on a PIP that were "individually tailored;" (Pl. Opp. 17-20); (4) Account Managers under 40 received more favorable job performance reviews than those over 40 (Pl. Opp. 23); and (5) his termination is part of a trend in the industry to hire more younger salespersons and fewer older ones (Pl. 56.1 Stmt. ¶ 17). The Court will address each argument in turn.

i. <u>Prior Performance</u>

With respect to Mr. Grant's prior performance, "no inference can be drawn from an employee's prior work record and satisfactory performance absent a clear temporal nexus to the

16

adverse employment decision." <u>Ashton v. Pall Corp.</u>, 32 F. Supp. 2d 82, 89 (E.D.N.Y. 1999) (holding that six years of positive reviews and salary increases followed by two years of negative reviews did not give rise to an inference of discrimination). Although Mr. Grant received satisfactory performance reviews during the first five years of employment, he received negative reviews during the fifteen months prior to his termination. "Dismissals are often preceded by adverse performance reviews. Were we to view this pattern as suspect, without more, many employees would be able to appeal their personnel evaluations to a jury." <u>Viola</u>, 42 F.3d at 718. Therefore, Mr. Grant's prior satisfactory reviews are insufficient to create an inference of discriminatory intent.

ii.    <u>Supervisor's Comments</u>

Second, Mr. O'Neal's comments are, at best, only weakly probative of discriminatory intent. The Court does not understand, and Mr. Grant does not explain, how Mr. O'Neal's remark that he should be more like a Jack Russell Terrier is at all related to age. And the other remark, allegedly made in Fall 2006, that sales is a "young man's game,"[8] is too far removed in time from his termination in 2008 to create any

---

[8] Although Mr. O'Neal denies making this statement (Def. 56.1 Counter-Stmt ¶ 142), in determining whether there is a genuine issue as to any material fact, the Court is required to draw all permissible inferences in favor of the non-moving party. <u>See</u> <u>McLee</u>, 109 F.3d at 134.

inference of discrimination. "Statements made long before and not in the context of the adverse action cannot support a claim of discriminatory motive for that action." Smith v. Revival Home Health Care, Inc., No. 97-CV-4415, 2000 WL 335747, at *4 (E.D.N.Y. Mar. 28, 2000); see also Bagdasarian v. O'Neill, No. 00-CV-0258, 2002 WL 1628722, at *4 (W.D.N.Y. July 17, 2002) (holding that a supervisor stating that "I already got two old farts that don't do anything anyway, what do I need another one for" with regard to plaintiff was not probative of discriminatory intent because it was made over one year before plaintiff was passed over for a promotion and without any continuing age comments).

Furthermore, "isolated comments cannot in and of themselves make out a case of employment discrimination." Ashton, 32 F. Supp. 2d at 90; see also O'Connor v. Viacom, Inc./Viacom Int'l Inc., No. 93-CV-2399, 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996) ("Many courts have held that stray remarks in the workplace, by themselves, without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's summary judgment motion.").

### iii. "Individually Tailored" Coaching Plan and PIP

Mr. Grant's argument that his "individually tailored" coaching plan and PIP are evidence of disparate treatment also

fails. While a plaintiff may raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group," Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1997), Mr. Grant does not do that here. His argument appears to be that since these documents were "developed specifically for Plaintiff" (Pl. 56.1 Stmt. ¶¶ 86, 99), they are somehow evidence of disparate treatment. This argument is confused, at best.

First, these documents were designed to set out and clearly identify Mr. Grant's performance deficiencies (Def. 56.1 Stmt. ¶¶ 87, 97; Pl. 56.1 Stmt. ¶¶ 87, 97), so they had to be individually tailored if they were to adequately address the areas in which Mr. Grant personally needed to improve. If his PIP was not individually tailored, and all of Roche's PIPs contained the same boilerplate language regarding general performance deficiencies, Plaintiff would have a stronger argument that the PIP was a mere formality and evidence of pretext.

Second, Mr. Grant does not contend, much less evidence, that Account Managers under the age of 40 received more favorable coaching plans or PIPs or that a different

process was used in drafting the coaching plans and PIPs of Account Managers under age 40. Mr. Grant's coaching plan and PIP actually may have contained more attainable goals than the plans of others; Plaintiff presented no evidence regarding the content of any other PIP. Without any evidence that his PIP was less favorable than any other Roche employee's PIP—let alone "less favorabl[e] than [the PIP] of a similarly situated employee outside his protected group," Graham, 230 F.3d at 39— the fact that Mr. Grant's PIP was "individually tailored" does not, without more, support an inference of discrimination.

### iv. Disparate Treatment of Account Managers under 40

Mr. Grant's argument that Account Managers in his region under the age of 40 received more favorable job performance reviews than those over the age of 40 (Pl. Opp. 23-24) fairs no better. To satisfy the fourth prong of the prima facie case by showing disparate treatment, the evidence offered must demonstrate "that [his] co-employees were subject to the same performance evaluation and discipline standards," and that they were not disciplined "despite engag[ing] in comparable conduct." Graham, 230 F.3d at 39. Mr. Grant identifies one potential comparator,[9] Rebecca Klim, who is under 40 years old.

---

[9] Mr. Grant also asks the Court to compare Ms. Klim's reviews and sales performance to Maureen Moroney's, who is over the age of 40. (Pl. Opp. 23-24.) The Court is not going to consider this

The parties do not dispute that all Account Managers were subject to the same workplace standards. (Def. 56.1 Stmt. ¶ 43; Pl. 56.1 Stmt. ¶ 43.)[10] The issue then is whether Ms. Klim and Mr. Grant engaged in comparable conduct for which he was disciplined and she was not. In support, Mr. Grant offers coaching reviews prepared by Mr. O'Neal after ride-withs with Mr. Grant in August 2006 and with Ms. Klim in September 2006 (Pl. Opp. Ex. 4) and an email from August 2006 comparing how close each Account Manager was to achieving his or her sales goals through June 2006[11] (Pl. Opp. Ex. 5). Mr. Grant then argues that these documents evidence disparate treatment because they show that Ms. Klim received "a better score overall" on her review than Mr. Grant, even though she achieved a lower percentage of her year-to-date sales goal than he did. (Pl.

comparison; it is irrelevant because "in a disparate treatment claim . . . an individual plaintiff must prove that he or she in particular has been discriminated against." <u>Braunstein v. Napolitano</u>, No. 07-CV-1015, 2011 WL 867247, at *1 (E.D.N.Y. Mar. 11, 2011).

[10] Defendant states that "Roche did not discriminate against any individual--including [Mr. Grant]--or group on any basis, including age, when setting [individual] goals or making evaluations based on those objections." (Def. 56.1 Stmt. ¶ 43.) Plaintiff states that those goals were unrealistic and unattainable for <u>all</u> Account Managers. (Pl. 56.1 Stmt. ¶ 43 ("Roche's sales goals can often be disconnected from the reality of the marketplace, regardless of the age of the particular Account Manager in question.").)

[11] Mr. Grant incorrectly states that the email reflects sales performance for August 2006. (Pl. Opp. 24.) The email, although dated August 29, 2006, clearly states that it reflects sales performance "through June 2006." (Pl. Opp. Ex. 5.)

Opp. 24.) Defendant responds by arguing that Mr. Grant is improperly relying on monthly evaluations as opposed to annual evaluations, which are a more accurate measure of performance and which clearly show Mr. Grant's performance deficiencies. (Def. Reply 8-9 & n.12.) This Court will not address which measure of performance is correct because Mr. Grant cannot even make an adequate showing of disparate treatment using his own evidence.

Mr. Grant, clearly unable to find evidence to support his claim that Ms. Klim received a higher rating for one particular month despite lower sales performance, cherry-picks ratings and reviews from different months in an attempt to craft a cognizable claim. The email cited by Plaintiff shows that as of June 2006, Mr. Grant did, in fact, achieve a higher percentage of his year-to-date sales goal than Ms. Klim. However, according to another email not cited by Plaintiff as of October 2006, Ms. Klim was closer to achieving her year-to-date goal than Mr. Grant. (Pl. Opp. Ex. 5.)

Then, Mr. Grant asks this Court to compare his ride-with from August 2006 to Ms. Klim's ride-with from September 2006, stating that they are from "a similar time period" (Pl. Opp. 24). Yet, Mr. Grant also was reviewed by O'Neal in

September 2006.[12]    Whereas Ms. Klim's review in September may
have been better than Mr. Grant's review in August, Mr. Grant's
September review is clearly better than Ms. Klim's September
review.[13]

Plaintiff has selectively chosen only the evidence
that supports his argument, to the exclusion of the remainder of
the record which suggests otherwise.    "Plaintiff cannot defeat a
summary judgment motion by cherry-picking [evidence] to concoct
some claim of disparity," Ragusa v. Malverne Union Free Sch.
Dist., 652 F. Supp. 2d 275, 282 (E.D.N.Y. 2009) (alteration in
original), thus, Mr. Grant has failed to show that Ms. Klim

---

[12] Plaintiff questions the authenticity of the additional ride-
with; however, the Court finds that these reports were properly
authenticated and are therefore admissible in support of
Defendant's motion for summary judgment.  "[E]vidence is
admissible as authentic 'if sufficient proof has been introduced
so that a reasonable juror could find in favor of authenticity
or identification.'" Bazak Intern. Corp. v. Tarrant Apparel
Group, 378 F. Supp. 2d 377, 391 (S.D.N.Y. 2005) (quoting United
States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991)).  Here,
Defendant submitted a Declaration by Mr. O'Neal stating that the
coaching reports attached and cited by Defendant are true and
accurate copies of the one he created and conveyed to Mr. Grant
after each ride-with. O'Neal Dec. ¶ 18 & Ex. I-O.  This is
sufficient to authenticate the documents. See, e.g., U.S. v.
Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007) ("The testimony of a
witness with knowledge that a matter is what it is claimed to be
is sufficient to satisfy [the authentication] standard.").
[13] In August 2006, Plaintiff received three C's and one O on his
review.  (Pl. Opp. Ex. 4.)   In September 2006, Klim received
three O's, two C's and one S.  (Pl. Opp. Ex. 4.)   In September
2006, Plaintiff received one O, four C's and one S. (Def. 56.1
Stmt. Ex. I, Pl. Dep. Ex. 25.)

received any preferential treatment with respect to her "ride-with" ratings at all, let alone because of her age.

Additionally, if Mr. Grant is arguing that Ms. Klim exhibited "sufficiently similar" performance deficiencies as Mr. Grant yet was not terminated, he has presented no evidence in support. He cites to no evidence showing that Klim was repeatedly criticized for performance deficiencies which she failed to correct.[14] Merely stating that Ms. Klim received preferential treatment without setting forth specific facts showing that they were similarly situated will not defeat Roche's summary judgment motion. See McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."); see also D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-

---

[14] In fact, the evidence shows the exact opposite. In Ms. Klim's September 2006 review, Mr. O'Neal criticized her for not "[f]ocus[ing] on learning more about [her] E accounts' critical needs," (Pl. Opp. Ex. 4), whereas in her December 2006 review Mr. O'Neal commented that "[s]he has been focusing more on her E accounts (Pl. Opp. Ex. 4)--evidence of improvement. On the other hand, Plaintiff's August 2006 review states that "[a]n area of focus is to spend more time in more of his E accounts," (Pl. Dep. Ex. 24), and his December 2006 review states that he "needs to drive his E account opportunities more diligently" (Pl. Dep. Ex. 30)--evidence of continued deficiencies.

moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

     v.  <u>Trend Towards Hiring Younger Salespersons</u>

    Finally, Mr. Grant argues that statistical and anecdotal evidence suggesting that around the time of his termination Roche was hiring more Account Managers under age 40 and firing employees over age 40 raises an inference of discrimination. He is again incorrect. "Although statistics are admissible in a disparate treatment case involving a single plaintiff, statistical evidence alone may not suffice to make out a prima facie case of discrimination." <u>DeLuca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.</u>, No. 06-CV-5474, 2008 WL 857492, at *14 (S.D.N.Y. Mar. 31, 2008) (citing <u>Martin v. Citibank, N.A.</u>, 762 F.2d 212, 219 (2d Cir. 1985)). This is because "in a disparate treatment claim . . . an individual plaintiff must prove that he or she in particular has been discriminated against." <u>Braunstein</u>, 2011 WL 867247, at *1 (internal quotation marks omitted). Mr. Grant's argument regarding the "trend" in the industry towards hiring younger salespersons fails for this reason as well.

vi.    <u>Evidence of Lack of Discrimination</u>

Mr. Grant's contention that his termination was the result of discrimination is further undermined by the fact that (1) Mr. Grant was a member of the protected class when he was hired (Def. 56.1 Stmt. ¶¶ 3-4; Pl. 56.1 Stmt. ¶¶ 3-4), <u>see</u> <u>Coleman v. Prudential Relocation</u>, 975 F. Supp. 234, 241 (W.D.N.Y. 1997) ("Although as plaintiff notes, her membership in the protected class at the time of her hire does not preclude her as a matter of law from bringing an ADEA claim, it certainly strains credulity to think that Prudential 'suddenly developed an aversion to older people' within a year after hiring plaintiff."); (2) Ms. Perry, Mr. O'Neal and Mr. Hitchens, those who decided to terminate Mr. Grant, were within same protected class as Mr. Grant (Def. 56.1 Stmt. ¶¶ 114, 116; Pl. 56.1 Stmt. ¶¶ 114, 116), <u>see</u> <u>Giordano v. Gerber Sci. Prods.</u>, No. 99-CV-0712, 2000 WL 1838337, at *7 (D. Conn. Nov. 14, 2000), <u>aff'd</u> 24 Fed. Appx. 79 (2d Cir. 2000) ("Where the decision-makers are also in the protected age group an inference may be drawn that there is no age-based animus."); <u>Starr v. Legal Aid Soc'y</u>, No. 96-CV-6888, 1998 WL 477733, at *3 (S.D.N.Y. Aug. 14, 1998) (stating that an inference of age discrimination was "implausible" when the decision-makers "were very close in age to plaintiff"); and (3) Mr. Grant was replaced by a member of the protected class who was just four years younger than him

(Def. 56.1 Stmt. ¶ 121; Pl. 56.1 Stmt. ¶ 121), see O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) ("replacement of one worker with another worker insignificantly younger" does not support inference of discrimination).

B. Legitimate Non-Discriminatory Reason

Although this Court does not find that Mr. Grant established a prima facie case, assuming arguendo that he did, the burden would shift to Roche to offer a legitimate, non-discriminatory reason for the employment action. See St. Mary's Honor Ctr., 509 U.S. at 506-07. To meet its burden, Defendant only needs to articulate the existence of a non-discriminatory reason for an adverse action that, if believed by the fact-finder, would support a judgment in Defendant's favor. See id. at 507. "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998).

Defendant here claims that Mr. Grant was terminated because of his "deficient performance in various areas (e.g. poor sales, poor strategic planning, and poor peer communication) over a fifteen-month period." (Def. Mem. 1.) These deficiencies are explicitly stated and well-documented in the evidence offered by Defendant, including numerous ride-with

27

coaching reports, the November 2006 email from Mr. Hitchens to Mr. Grant identifying areas where Mr. Grant needed to improve to advance at Roche, Mr. Grant's 2006 Performance Appraisal with an overall performance rating of "Needs Development," the September 2007 coaching plan, and ultimately the PIP. The sole reason for his termination, according to his termination letter, was Mr. Grant's "inability to meet performance expectations." (Def. 56.1 Stmt. Ex. I, Pl. Dep. Ex. 43.) Courts have held that failure to meet an employer's performance expectations is a legitimate, non-discriminatory reason for termination, see, e.g., Revere v. Bloomingdale's, Inc., No. 03-CV-5043, 2006 WL 3314633, at *8 (E.D.N.Y. Nov. 14, 2006) ("[Defendant] has produced a detailed record of Plaintiff's performance deficiencies leading up to Plaintiff's discharge and has, therefore, met its burden [of articulating a legitimate, non-discriminatory reason for firing Plaintiff].");  Wilkes v. Sears Holding Corp., No. 07-CV-0758, 2008 WL 4394680, at *5 (E.D.N.Y. Sept. 23, 2008), therefore Defendant has satisfied its burden.

    C.    Pretext

        Under McDonnell Douglas, the burden then shifts back to Mr. Grant to demonstrate that Defendant's proffered explanation was pretextual. See Slattery, 248 F.3d at 93. To prevail, Mr. Grant must "show that defendant's decision to terminate him was, in fact, the result of age discrimination."

28

*Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 246 (E.D.N.Y. 2010). Thus, the Court must now determine whether Plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause of [Defendant's] decision to fire [him]." *Gorzynski*, 596 F.3d at 107.

"Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (citations and internal quotation marks omitted). "A 'fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable,' but should instead 'determin[e] whether the articulated purpose is the actual purpose for the challenged employment-related action.'" *Miller*, 703 F. Supp. 2d at 246 (alteration in original) (quoting *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170-71 (2d Cir. 1993)).

According to Defendant, the basis for its decision to terminate Mr. Grant's employment was his consistent failure over a fifteen month period to meet Roche's standards for sales. To refute that his termination was performance-based, Mr. Grant points to his annual performance reviews from 2001 to 2005 where

he received "Meets Expectations" or "Exceeds Expectations" ratings. But, as explained earlier, "[t]he mere fact that an employee received positive performance evaluations and subsequently received negative evaluations is insufficient to establish that the latter were pretextual." <u>Miller</u>, 703 F. Supp. 2d at 246-47.

In fact, those early satisfactory evaluations actually weigh against an inference of pretext because they show that the Defendant's proffered non-discriminatory reasons for terminating Mr. Grant were articulated before the allegedly discriminatory animus surfaced in 2006.[15] <u>See Miller</u>, 703 F. Supp. 2d at 246-47 (early satisfactory evaluations documenting performance deficiencies were evidence that later termination based on those same performance deficiencies was not pretextual).

Rather than point to evidence of age-based animus, Mr. Grant instead argues that his supervisors' criticisms were unwarranted and baseless. (Pl. Opp. 8-12, 13-17.) However, "[i]t is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's

---

[15] For example, Roche repeatedly expressed concern as early as 2001 that Mr. Grant's sales were too low. (Pl. 56.1 Stmt. Ex. B (Mr. Grant's 2001 annual performance review stating that "Martin needs to devote more focus to penetrating and driving sales at competitive accounts for closes"); <u>id.</u> at Ex. D (2002 review stating that "[o]verall growth needs to be improved"); <u>id.</u> (2005 review stating that "[t]he main challenge for Martin in 2006 is to close more targeted competitive E accounts").)

misconduct or deficient performance, or even has evidence that
the decision was objectively incorrect, does not necessarily
demonstrate, by itself, that the employer's proffered reasons
are a pretext for termination." Kalra v. HSBC Bank USA, N.A.,
567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008) (citing McLee, 109 F.3d
at 135); see also Soderberg v. Gunther Int'l, Inc., 124 Fed.
Appx. 30, 32 (2d Cir. 2005) ("[I]t is not the function of a
fact-finder to second-guess business decisions regarding what
constitutes satisfactory work performance."); Iverson v. Verizon
Commc'ns, No. 08-CV-8873, 2009 WL 3334796, at *5 (S.D.N.Y. Oct.
13, 2009) ("Merely disagreeing with a supervisor's assessment of
work performance, however, is insufficient to raise a triable
issue of fact regarding pretext"). An "employer may fire an
employee for a good reason, a bad reason, a reason based on
erroneous facts, or for no reason at all, as long as its action
is not for a discriminatory reason." Kalra, 567 F. Supp. 2d at
398 (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181,
1187 (11th Cir. 1984)). Therefore, Mr. Grant's own perceptions
and opinions of his performance do not create a genuine issue of
fact requiring trial.

Finally, Mr. Grant makes the conclusory allegation
that he will prove at trial that Mr. Hitchens and Ms. Perry were
motivated by discriminatory animus. (Pl. 56.1 Stmt. ¶ 17.)
However, it is well established that "for a discrimination

31

plaintiff to survive a motion for summary judgment, he must do more than present conclusory allegations of discrimination, he must offer concrete particulars to substantiate his claim." Ashton, 32 F. Supp. 2d at 91. When opposing a motion for summary judgment, "a party does not have the luxury to wait till trial's inception to first establish the prima facie elements of a claim." Id. Mr. Grant has completed discovery and had the opportunity to depose all of Defendant's witnesses. The fact that state of mind may be relevant does not preclude summary judgment. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."). Mr. Grant's blanket statement, therefore, has no probative value.

## CONCLUSION

Because the record is devoid of any evidence that age was a motivating factor in--let alone the "but-for" cause of-- Roche's decision to terminate Mr. Grant's employment, Roche's motion for summary judgment is GRANTED. The Clerk of the Court is directed to mark this matter closed.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    July __20__, 2011
          Central Islip, New York